No. 26,561.

THE STATE OF KANSAS, *Appellee*, v. LEE STOCKTON, *Appellant*.

SYLLABUS BY THE COURT.

CRIMINAL LAW—*Instructions*—*Matters Foreign to Issue.* An instruction to the jury relating to its duty not to be influenced by matters foreign to the issues, approved.

Appeal from Jefferson district court; MARTIN A. BENDER, judge. Opinion filed December 5, 1925. Affirmed.

*H. N. Casebier* and *H. T. Phinney,* both of Oskaloosa, for the appellant.

*C. B. Griffith,* attorney-general, *C. A. Burnett,* assistant attorney-general, *Lloyde Morris,* county attorney, *Oscar Raines* and *John J. Schenck,* both of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of assault with intent to commit rape, and appeals.

On the evening of October 28, 1924, the local organization of Knights of the Ku Klux Klan at Meriden held a meeting. Defendant was a member. He went to the vicinity of the stairway leading to the hall where the meeting was to be held, conversed with another member, and gave an excuse for not going up when it was time for the meeting to begin. About an hour later, when prowling just outside the city limits, he saw a woman hanging clothes on a line at the back of her home. He attacked her, and persisted until his intention was manifested. He wore a mask, made by cutting eyeholes in one of his wife's old stockings which he found in a rag bag in his coal house. As the struggle continued he was about to be unmasked, whereupon he desisted and ran away. When he turned the corner of the house he threw down the mask. The woman gave an alarm, which reached the Klan meeting. The meeting dissolved, the fact of the outrage was verified, and in a short space of time an aroused community was engaged in search for the culprit. Perusal of the record leads to the inference that there were cogent but undisclosed reasons for suspecting defendant, and that his house was placed under surveillance. About ten o'clock a man stationed in a pasture, probably 100 feet from the house, saw defendant enter the back door in a stooping posture. Soon afterward a body of men, fifteen,

Criminal Law, 16 C. J. § 2350.

twenty, possibly twenty-five in number, some of whom had talked with the woman, assembled in front of the house and called defendant out. He was told he was under suspicion; if he was innocent every man there was for him; if he was guilty the case was one for the law to handle; and the best way to clear up the matter would be to pick a committee with whom defendant could talk it over. Defendant chose a committee of five and went with them to the home of Will Gay for conference.

Defendant's wife had been in Topeka attending a woman's Ku Klux Klan gathering as a delegate. On her return to Meriden she went home, heard of the outrage, turned off the lights and went to a neighbor's. A witness for the state testified as follows:

"Before the committee went into the Gay home, and while Doc Preston and I were in the front seat of the car, two ladies came across the street. They were Mrs. Conroy and defendant's wife. As I stepped out of the car the defendant's wife thought I was the doctor, and said, 'Do you suspicion any one, Doctor?' And I said, 'We have a man in the car we are going to question.' She said, 'Who is it?' And I told her it was Lee Stockton, and she broke down right away. I had opened the car door, and she said to her husband, 'Lee, my God, what have you been doing?' He said, 'I have not been doing anything; I have been home in bed.' She said, 'You have not; I have been home, and you were not there.' He called her Helen, and said, 'My God, shut your mouth and go home.'"

At the conference at Gay's house defendant denied guilt and undertook to account for his whereabouts during the evening. While struggling with the woman he was obliged to keep one hand over her mouth to prevent her from screaming, and she bit him. When his attention was called to the fresh wound on his little finger, he said he scratched it when going through a wire fence on the way to the barn. After defendant had been examined by the committee at some length his wife came in. The details of what occurred need not be recited. It is sufficient to say the conference ended with a confession of guilt made without threat or inducement, under circumstances described by one of the witnesses present as follows:

"The defendant and his wife were around the west side of the house to the north of the Gay home, standing with their arms around each other crying. I told the defendant that it was no use to carry on that way—to buck up. If he was guilty we both wanted him to confess, and if he was not guilty not to confess; that we did not want him to confess to anything he was not guilty of; we are here to protect you. She said, 'If you are guilty, why don't you tell me?' And he said, 'If I would confess you would leave me.' She said, 'I won't.' Then he said, 'I am guilty.' The defendant said, 'My God, what possessed me to do this?' and I said, 'I don't know.'"

Defendant was taken to the city jail about midnight and the sheriff was called by telephone. The sheriff arrived about one o'clock and took defendant to the county jail at Oskaloosa. While in the city jail defendant made incriminating admissions to persons who conversed with him. Doctor Preston asked him what induced him to do as he had done. He commenced to sob, and said, "I don't know, Doctor." The doctor then asked him if he was possessed of such passion that he would lose control of himself. Defendant replied, "Doc, that is it—I just go crazy."

After he had confessed, defendant became scared. He trembled, and was afraid he would be mobbed, but he was assured he would be protected. There were people on the streets of Meriden that night. The sheriff estimated the number at from seventy-five to eighty. No resident of Meriden testified to seeing more than one-third of that number, but whatever the number, the sheriff testified to no menace or disorder, and the evidence for the state was that there was no loud talking or noise or commotion at any time, and that the people wherever congregated were perfectly quiet and orderly.

After taking a ruffian's chance and losing, defendant was not sportsman enough to plead guilty and go becomingly to the penitentiary; and there had to be a trial. The defense was that he was intimidated into confessing. He said he was told that bloodhounds had been sent for, but the dogs would be called off if he would confess. Of course dogs could not pick up his trail at the scene of the crime unless he had been there, and if he were innocent he ought to have welcomed bloodhound demonstration of the fact. He said he heard the mob downtown, cars chasing up and down, and loud talk, and Gay placed his hand on his shoulder and said, "Lee, there are a hundred men down there, and you don't know what they will do. Confess, and we will protect you." So he got excited and confessed. He had lived in the vicinity of Meriden for twenty-five years, and he called no witness from that community to testify in his behalf, except his wife.

The appeal presents two subjects. One of them has been declared to be without merit so often it need not be discussed. The other is, propriety of an instruction given the jury.

The witnesses for the state were chiefly Klansmen, who, on cross-examination, frankly declared themselves to be such. The local order employed counsel to assist in the prosecution. In this country

State v. Stockton.

trials of criminal cases are public trials. Klansmen attended the trial, and as frequently occurs in cases of intense interest and importance, the court was occasionally called on to admonish the audience not to give expression to its sentiments. Under these circumstances the court instructed the jury as follows:

"By the undisputed evidence in this case it has been shown that the local order of the Knights of the Ku Klux Klan at Meriden is aiding in the prosecution of the defendant. It is laudable for this organization, or any other, to use its influence and efforts for law enforcement; but as jurors you must not let this action of this order influence you in the slightest degree, but you should decide the case wholly from the evidence in the case and as defined in these instructions. For a juror to allow himself to be influenced in this case by reason of the said action of the Ku Klux Klan, and by that influence, through sympathy for or against it, to be led to a conclusion on the case, would be almost as reprehensible as the crime charged in the case."

Defendant contends the court usurped the province of the jury in declaring, not that it was lawful, but that it was laudable for the Klan to aid in the prosecution of defendant. The instruction was that the Klan was aiding in the prosecution, and it was laudable for it, or any other organization, to use its influence and efforts for law enforcement. However, defendant's interpretation of the instruction may be accepted. A shocking crime was committed at night in the little city of Meriden. The Klan meeting adjourned, the salient facts were ascertained, the offender was discovered, an inquest by a fairly constituted committee was held, a voluntary confession was received and the offender was placed in custody of the sheriff, all within the space of a few hours, the community meanwhile maintaining perfect self-control. All that was admirable. It was within the range of possibility that the fruits of this good work might be jeopardized at a trial before a jury, where perjury might be practiced, technicalities of the law invoked, and the arts of skillful defending counsel displayed. So the Klan lent aid to the prosecution. That was using its influence and effort for law enforcement. This court finds no occasion for trimming between "lawful" and "laudable," and finds no fair basis for two views on the subject. The Klan's action was praiseworthy; that is, laudable.

But counsel for defendant say the Klan was cleaning house by prosecuting one of its own members. The woman attacked was the wife of a Klan member. She was the mother of three children. She was hanging clothes by the light of a lamp shinging through a window, and there were five little girls in the house at the time. It was

not good form for a member of the order to absent himself from a lodge meeting and attempt to ravish a brother member's wife under these circumstances, and it would seem the order, as an order, might properly take umbrage at his conduct.

But counsel for defendant say the atmosphere of the trial was pervaded with the spirit of the Invisible Empire. Barometric readings of courtroom atmosphere are likely to differ. For example, one of defendant's counsel was cross-examining a woman who was a witness for the state:

"Q. Are you a Klucker, too? A. I sure am, and you might be better off if you were one too."

Counsel say a demonstration in the courtroom ensued. Counsel for the state say the audience did seem pleased at the result of this little encounter in the field of personalities. So, views respecting trial conditions must be brought on the record by affidavit, which may be met by counter affidavit, and the facts must be determined by the trial court upon the proof and the court's own knowledge.

The record discloses that the Ku Klux Klan would have received but incidental mention at the trial if defendant had not seized upon it to divert attention of the jury from the merits of the case. The court met the situation with the instruction which has been quoted, and which could have had no other effect than to keep the jury in the path of duty.

The judgment of the district court is affirmed.